Affirmed and Opinion filed January 10, 2006









Affirmed
and Opinion filed January 10, 2006.

 

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

NO. 14-04-00892-CR

____________

 

FREDERICK WAYNE
JOHNSON,
Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 177th
District court

Harris County, Texas

Trial Court Cause No. 527,808

 



 

O P I N I O N

In February 1990, appellant, Frederick
Wayne Johnson, was convicted of aggravated sexual assault of a child and
sentenced to life in prison.  In 2001, he
filed a motion seeking DNA testing of biological evidence obtained during the
investigation of the assault.  The trial
court ordered the testing and then held a hearing regarding the results.  The trial court found that the results were Anot favorable@ to appellant
under Chapter 64 of the Texas Code of Criminal Procedure.  On appeal, appellant contends that the trial
court erred in (1) considering new evidence filed by the State that was not
presented in the original trial, and (2) finding that the results were not
favorable.  We affirm.








Background

At trial, Rhonda Kelso testified that on
August 31, 1988, she was walking toward her house when appellant tried to
entice her to approach him, but she ignored him.  Later upon leaving her house, she saw him
again and hid her face behind her umbrella. 
When she returned home, she saw him a third time, and he grabbed her by
the arm and told her A[C]ome here, I=ve got to tell you
something.@ 
She managed to pull away and continue walking, but a short time later
she heard a scream and turned around to see that appellant had grabbed a female
and was pulling her into a building.  The
female said Aokay, okay@ but was trying to
resist.  Appellant steadily pulled her
until they were in the building.  Kelso
found a telephone and called 911.  She
also asked a group of electrical workers for help and one of them called 911 as
well.  A police officer arrived, and
Kelso asked one of the men she had asked for help to show the officer the
correct building.  He did so, and the
officer entered the building and came out a few minutes later with appellant
and a girl.  Kelso stated that she was
able to Aget a good look@ at appellant when
he exited the building in handcuffs.  She
identified appellant as the same man who had accosted her earlier and who had
dragged the girl into the building.








The complainant testified that on August
31, 1988, she was sixteen years old.  She
was walking away from her house when appellant crossed the street and asked her
if she knew where a particular street was located.  She did not know and kept walking, and he
walked the other way.  She then felt like
someone was following her, and she turned around to see appellant behind
her.  She screamed, and he grabbed her by
the hair and pushed something to her back. 
He told her to stop screaming or he would kill her, and she stopped
screaming.  He then told her to walk
across the street.  She was terrified and
tried to pull away, but he had a steady grip on her and took her inside an
abandoned building to a room with a lot of glass and dirt on the floor.  He again threatened to kill her and ordered
her to take off her clothes.  She took
off her shorts and underwear; he told her to lie down on the floor and she
did.  Appellant fondled her breasts and
then unzipped his pants and put his penis in her vagina.  She was crying and felt scared.  After about fifteen minutes, appellant told
her to get up and that he was taking her to a house.  She thought he was going to kill her.  A uniformed police officer then walked into
the room and handcuffed and arrested appellant. 
Complainant was taken home and then to the hospital where she was
examined by a doctor, and a rape kit was prepared.  She stated that she had never seen appellant
before the day of the assault.

Officer Willie C. Curry, of the Houston
Police Department, testified that on August 31, 1988, he responded to a call
that a possible rape was in progress. 
When he arrived at the scene, a man directed him to a particular
building, and he parked his vehicle and entered the building with his weapon
drawn.  He heard a man=s voice say A[N]ow we are going
to go to my house.@ 
Officer Curry entered the room where the voice had come from as
appellant and complainant were exiting. 
Curry told appellant to get down on the floor; he then handcuffed appellant
and walked him out of the building. 
Appellant told Curry that complainant was his wife or girlfriend.

Dr. Robert Noel testified that he
performed a physical examination of complainant on August 31, 1988.  She had sand in her hair and on her
shoulders, neck, and back.  She had a small
laceration on her back.  In examining
complainant=s vaginal vault, he found sand, a string
of blue textile material, and a white substance that resembled semen.  He described finding the string in that
location as being particularly unusual. 
All three of the prior witnesses, Kelso, complainant, and Curry, had
testified that appellant was wearing a blue sweat shirt and blue warm-up pants
on the day of the assault.  In describing
her attire on that day, complainant stated the color of each garment but did
not identify any of them as being blue. 
Noel further testified that he asked complainant if she had had any
sexual activity in the 72 hours prior to the examination, and she replied Ano.@  Although Noel did not specifically testify
that complainant told him that she had been sexually active in the past, his
testimony suggests that she told him she had been.  In explaining his procedures for such
examinations, Noel stated that he first asks whether the patient has ever had
sexual intercourse and then, presumably based on the answer, he asks whether
the patient has had sexual intercourse in the prior 72 hours.








Cleva West, a serologist with the Houston
Police Department Crime Laboratory, testified that she obtained a cutting from
complainant=s underwear and the vaginal swabs taken
during the physical examination.  She
performed tests on those items and determined that semen was present on them.

Appellant did not testify at trial.  No evidence was offered to suggest any reason
why appellant would have been arrested by Officer Curry in the room of the
abandoned building with complainant, other than that he was in fact the man
that Kelso saw abduct complainant and whom complainant said raped her.

Pursuant to the trial court=s order of October
28, 2002, Kristi P. Wimsatt, a criminalist with the Texas Department of Public
Safety Laboratory in Houston, conducted DNA testing on the cutting from
complainant=s underwear, the vaginal swabs taken
during her physical examination, and a sample of appellant=s blood.  The test results on the underwear cutting
showed that the DNA in the semen stain did not match appellant=s DNA.  The test performed on the vaginal swab was
unable to ascertain a DNA profile.

Also attached to the State=s motion for
findings of fact was an affidavit signed by complainant, in which she averred,
among other things, that she had a boyfriend at the time of the assault and was
sexually active during that period of time. 
However, she stated that she does not recall the exact date or time that
she had sexual relations with her boyfriend prior to the assault.  She further stated that she does not recall
whether appellant ejaculated during the assault.








Additionally attached to the State=s motion were the
results of DNA testing conducted in 1989. 
These results indicated that the DNA found on the vaginal swabs matched
appellant=s DNA profile from a blood sample.  However, apparently owing to testing
limitations of the time, the results state that the DNA on the swabs would
match approximately 1 in every 325 members of the North American black male
population and 1 in every 5,554 members of the North American white male
population.  The 1989 testing was unable
to isolate a DNA profile on the underwear cutting for comparison.  These results were not introduced in the
original trial.

New Evidence

In his second issue, appellant contends
that the trial court erred in considering new evidence that was not presented
in the original trial.  Specifically,
appellant argues that the court should not have considered the complainant=s affidavit filed
by the State.  In his briefing of this
issue on appeal, however, appellant provides no citation to the record or to
authority.  See Tex. R. App. P. 38.1(h) (requiring that
appellant=s brief must contain appropriate citations
to the record and to authority). 
Accordingly, this issue is improperly briefed.  See Tong v. State, 25 S.W.3d 707, 710
(Tex. Crim. App. 2000) (holding that even a novel argument must be grounded in
the relevant jurisprudential framework for evaluating the claim).  Furthermore, in the trial court, although
defense counsel urged the court not to consider the affidavit in making its
decision, counsel never objected to the document, and the trial court never
ruled on any such objection or argument.[1]
 Accordingly, this issue was not
preserved for appellate review.  See
Tex. R. App. P. 33.1(b)
(providing that to preserve error a party must make a timely and sufficiently
specific request, objection, or motion and obtain a ruling thereon or object to
the court=s refusal to rule).  Consequently, appellant=s second issue is
overruled.

Results Not Favorable








In his first issue, appellant contends
that the trial court erred in finding that the DNA test results were not
favorable to him.  Under the version of
article 64.04 applicable at the time appellant filed his motion, once a trial
court has ordered and received DNA testing results, the court must Ahold a hearing and
make a finding as to whether the results are favorable to the convicted person.@  Act of April 5, 2001, 77th Leg., R.S., ch. 2,
'2, 2001 Tex. Gen.
Laws 2, amended by Act of Apr. 25, 2003, 78th Leg., R.S., ch.13, ' 4, 2003 Tex. Gen.
Laws 16.[2]  Results are considered favorable under the
article only if Ahad the results been available before or
during the trial of the offense, it is reasonably probable that the person
would not have been prosecuted or convicted.@  Id. 
The trial court specifically found that the DNA test results were not
favorable to appellant under article 64.04.

We review the court=s decision under a
bifurcated standard, providing almost total deference to the court=s determination of
historical fact issues and application‑of‑law‑to‑fact
issues that turn on credibility or demeanor, but reviewing de novo other issues
involving the application of law to facts. 
Baggett v. State, 110 S.W.3d 704, 706 (Tex. App.CHouston [14th
Dist.] 2003, pet. ref=d). 
Although there may exist subsidiary fact issues that are reviewed
deferentially, the ultimate question of whether a reasonable probability exists
that exculpatory DNA tests would prove innocence is an application-of-law-to-fact
question that does not turn on credibility and demeanor and is therefore
reviewed de novo.  Id. (citing
Rivera v. State, 89 S.W.3d 55, 59 (Tex. Crim. App. 2002) (discussing
article 64.03, not 64.04)).








In order to demonstrate a Areasonable
probability@ that he would not have been prosecuted or
convicted, as required under article 64.04, appellant must show a reasonable
probability that exculpatory DNA tests would prove his innocence.  Id. (citing Rivera, 89 S.W.3d
at 59).  A reasonable probability of
innocence exists when there is a probability sufficient to undermine confidence
in the outcome.  Id. (citing Thompson
v. State, 9 S.W.3d 808, 812 (Tex. Crim. App.1999)).  A reasonable probability of innocence does
not exist if there is sufficient evidence, other than the DNA evidence in
question, to establish guilt.  Id.  (citing Rivera, 89 S.W.3d at 60).  Thus, a trial court does not err by finding
DNA test results Anot favorable@ if the post‑conviction
results fail to demonstrate a reasonable probability of innocence in the face
of other evidence that is sufficient to establish guilt.  Id.

Here, the DNA test results demonstrate
that appellant could not have been the source of the semen stain on the cutting
from complainant=s underwear.  Although this evidence is certainly
exculpatory in nature, we do not consider it in a vacuum.  It must be evaluated in the context of the
other relevant evidence, particularly: (1) the results of DNA testing on the
vaginal swabs, (2) the unusually persuasive eyewitness testimony, and (3) the
evidence that complainant was sexually active during the period of time in
which the assault occurred.

The 2004 DNA testing was unable to isolate
a DNA profile on the vaginal swabs taken during complainant=s physical
examination.  Additionally, the DNA
testing performed in 1989 found that appellant could in fact have been the
source of the semen Dr. Noel observed in complainant=s vaginal
cavity.  Thus, it is an open question,
not answered by the 2004 testing, whether appellant was the source of the semen
inside complainant=s vaginal cavity but not the source of the
semen on the underwear cutting.[3]








Furthermore, the eyewitness testimony in
this case was particularly compelling and in several respects less open to
misidentification than in many cases based primarily on eyewitness
testimony.  Complainant=s identification
of appellant as her attacker was corroborated by other witnesses who saw
appellant with complainant immediately before and immediately after the
assault.  As described in detail above,
Kelso saw appellant three times that day in the same area in which he abducted
complainant; indeed, she testified that appellant grabbed her as well, but she
managed to get away.  Kelso additionally
testified that the man whom she saw being taken out of the building in
handcuffs was the same man who had dragged complainant into the building.  Officer Curry testified that he discovered
appellant in a room of an abandoned building with complainant.  Curry, therefore, did not arrest appellant
well after the time of the offense based on a description provided by an
eyewitness, as often occurs in eyewitness cases; he arrested appellant in a
room where appellant was alone with the victim immediately after the
assault.  Cf. Torres v. State, 104
S.W.3d 638, 641 (Tex. App.CHouston [1st
Dist.] 2003, pet. ref=d) (noting appellant was arrested at scene
of the crime after loading stolen items in a vehicle).  Taken together, the eyewitness testimony of
Kelso, complainant, and Curry presents a seamless thread that renders the
possibility of mistaken identity particularly slight.[4]  Their testimony was also supported by
physical evidence garnered after the assault, including, especially, the blue
string discovered by Dr. Noel in complainant=s vaginal
cavity.  Further, appellant offered no
explanation at trial to explain why he was alone in the room with complainant.








Lastly, both complainant=s affidavit
attached to the State=s motion and Dr. Noel=s testimony at
trial suggested that complainant was sexually active during the period of time
in which the assault occurred.  That
provides an alternative explanation for the source of the semen stain on the
underwear cutting.  Based on our review
of the evidence as a whole, we conclude that the DNA test results do not
demonstrate a reasonable probability of appellant=s innocence
because there was sufficient other evidence to establish guilt.  See Baggett, 110 S.W.3d at 706.  Consequently, the trial court did not err in
finding that the results were not favorable to appellant.  Appellant=s second issue is
overruled.

We affirm the trial court=s order.

 

 

 

 

 

 

/s/      Adele Hedges

Chief Justice

 

 

 

 

Judgment
rendered and Opinion filed January 10, 2006.

Panel
consists of Chief Justice Hedges and Justices Yates and Anderson.

Publish C Tex. R. App. P. 47.2(b).











[1]  Indeed, the
trial judge never indicated whether she intended to or did consider the
affidavit in making her determination. 
Thus, we cannot infer that the court implicitly rejected defense counsel=s arguments.  See Tex.
R. App. P. 33.1(b).





[2]  The 2003
amendment to article 64.04 Aapplies only to a convicted person who on or after the
effective date of this Act [September 1, 2003] submits a motion for forensic
DNA testing.@  Act of Apr.
25, 2003, 78th Leg., R.S., ch. 13, ''
8, 9, 2003 Tex. Gen. Laws 16, 17; see also Booker v. State, 155 S.W.3d
259, 262 n.2 (Tex. App.CDallas 2004, no pet.). 
The changes affected by the amendment, however, appear grammatical in
nature.





[3]  Appellant
postulates that because semen was found in complainant=s vaginal cavity, the stain on her underwear must have
been caused by leakage of this same semen, and thus, it must have been from the
same source.  Although this is a possible
conclusion, it does not appear to be the only possible conclusion; indeed, appellant
provided no evidence, authority, or further reasoning in support of this
conclusion.  Further, complainant did not
testify at trial that appellant ejaculated during the assault, and she stated
in her affidavit that she did not remember if he ejaculated.

Additionally, the Court of Criminal
Appeals opinion in Smith v. State, 165 S.W.3d 361 (Tex. Crim. App.
2005), is distinguishable from the present case.  In Smith, the Court reversed lower
court rulings under article 64.03 and ordered DNA testing to be performed on
biological material.  165 S.W.3d at
365.  The State argued that because the
victim lived with her boyfriend, the seminal fluid that was found during her
physical examination may have been her boyfriend=s and
not her attacker=s; thus, DNA testing would not be exculpatory, even
assuming it did not match the defendant=s
DNA.  Id. at 364.  The court rejected this argument because (1)
the victim testified at trial that her attacker left seminal fluid during the
attack, and (2) there was no evidence that the victim had intercourse with
anyone other than her attacker during the 24 hours preceding the exam.  Id. at 364-65.  In the present case, the DNA testing that
excluded appellant as the source was not done on the fluid found inside complainant=s vaginal cavity but was performed on a stain found on
her underwear, which could have been left more than 24 or even 72 hours
earlier.  Additionally, as mentioned
above, there was no evidence that appellant ejaculated during the assault other
than the presence of semen in complainant=s
vaginal cavity and only conjecture that the source of the semen on the
underwear cutting was the same as the source of the semen in the vaginal
cavity.  For these reasons, the present
case is distinguishable from Smith. 






[4]  The similarity
and consistency of details in the testimony of the three witnesses is
remarkable, ranging from the description of the building to the description of
appellant, his clothes, and his hairstyle.